*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2001 FED App. 0175P (6th Cir.)
File Name: 01a0175p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

        *v.*                              No. 99-5471

WILLIAM M. LANDHAM,
        *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Ashland.
No. 98-00010—Henry R. Wilhoit, Jr., District Judge.

Argued: October 26, 2000

Decided and Filed: May 25, 2001

Before: SUHRHEINRICH and MOORE, Circuit Judges;
        EDMUNDS, District Judge.*

_____

## COUNSEL

**ARGUED:** Michael J. Curtis, CURTIS LEGAL SERVICES, INC., Ashland, Kentucky, for Appellant. Kenneth R. Taylor, ASSISTANT UNITED STATES ATTORNEY, Lexington,

_____

*The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

Kentucky, for Appellee. **ON BRIEF:** Michael J. Curtis, CURTIS LEGAL SERVICES, INC., Ashland, Kentucky, for Appellant. Kenneth R. Taylor, Charles P. Wisdom, Jr., ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, for Appellee.

————————

**OPINION**

————————

### I. Introduction

SUHRHEINRICH, Circuit Judge. Defendant William Landham was convicted of one count of knowingly transmitting a threat to kidnap in interstate commerce, in violation of 18 U.S.C. § 875(c) (Count Three); one count of knowingly transmitting a threat to injure in interstate commerce, also in violation of 18 U.S.C. § 875(c) (Count Four); and one count of making interstate telephone calls that were lewd, indecent, obscene, and lascivious, with the intent to abuse, harass, and annoy another person, in violation of 47 U.S.C. § 223(a)(1)(A) and (B) (Count Five).[1] On appeal, Landham asserts that this Court should reverse his convictions because the district court abused its discretion in denying his motion to dismiss as to Counts Three and Four as his statements were not "true threats," and were therefore, constitutionally protected speech under the First Amendment; erred in denying his motion for judgment of acquittal as to Counts Three and Four because his statements were not "true threats"; erred in denying his motion for acquittal as to Count Five because his statements were not obscene; and abused its discretion in allowing the Government to introduce evidence of prior bad acts. Landham further alleges that the Government violated his Fifth Amendment right against self-incrimination by commenting during closing argument on

———

[1]Under the current version of the statute, subsections (A) and (B) are contained in (1)(A). *See* 42 U.S.C.A. § 223(a) (West Supp. 2000).

### III. Conclusion

Emotionally charged language, which is the only form of domestic abuse at issue in this case, is almost inevitable in the context of domestic relations disputes. Determining whether that language crosses the fine line between protected speech and true threats is a delicate question. District courts and prosecutors must therefore be careful not to let the personalities and interpersonal dynamics of the parties interfere with that legal analysis.

For all the foregoing reasons, we **REVERSE** Defendant's convictions on Counts Three, Four and Five and **REMAND** to the district court with instructions to enter a judgment of acquittal as to all three counts.

whether the [statement] depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the [statement], taken as a whole, lacks serious literary, artistic, political, or scientific value."

*Id.* at 24.

The Government failed to establish that Landham's phone calls were obscene communications. In his phone calls, Landham made comments such as, "herpes slut," "cuntless fuck," and "unmotherly piece of crap." These comments are admittedly "lewd, lascivious, filthy, or indecent." § 223(a). But they are not obscene. Landham's statements were invectives; he was swearing, vulgarly, at his wife because he was frustruated with their relationship. It could hardly be said that Landham's comments would appeal to the prurient interest of the average person. *See United States v. Darsey*, 342 F. Supp. 311, 312 (E.D. Pa. 1972) (noting that "[t]he legislative history of [prior version of 223(1)(A)] makes it clear that 223(1)(A) was pointed at the problem of what is generally and colloquially understood to be an "obscene telephone call", that is, a verbal sexual or sado-sexual assault made over the telephone for the perverted pleasure derived from it . . . [and not] to make criminal the use of ungenteel or vulgar language sometimes called "obscene" in the course of an interstate telephone conversation, either from habit, anger, or slanderous intent."). *See generally Sable Communications of California, Inc. v. FCC*, 492 U.S. 115, 126 (1989) ("sexual expression which is indecent but not obscene is protected by the First Amendment"). Thus, under *Apollomedia*, Landham's statements are not a violation of § 223(a). Therefore, we reverse and remand to the district court to enter a judgment of acquittal as to Count Five.

Given our disposition of Counts Three, Four, and Five, we need not address Landham's remaining issues.

Landham's silence. For the following reasons, we **REVERSE** all three convictions.

## II. Background

Landham's convictions arise out of his tempestuous relationship with Belita Adams. In 1984, Landham, an actor, met Adams, an aspiring model, in New York City. Landham was about forty-two years old, Adams was nineteen. The two became romantically involved, and Adams moved to Los Angeles with Landham.

Adams characterized the relationship as "very stormy," "fast-paced," and with "a lot of drug and alcohol abuse." Adams testified that Landham became offensive and volatile when he was under the influence of either alcohol or drugs. However, she also testified that Landham never hit her throughout their entire relationship. Adams stated that Landham was "very much different" when he was sober – "very personable," "very intelligent."

The relationship in Los Angeles lasted about two and one-half years, but it was "very on and off during that whole period." At one point, after Landham shot a pistol past her head, Adams moved out. They maintained an on-again, off-again relationship, however.

Adams moved away in 1986 or 1987, and had no contact with Landham until 1995. On February 7, 1994, Adams' father, a school superintendent in Florida, was killed by a disgruntled employee. Adams' father was shot with a five-shot Taurus pistol, a fact whose significance will become apparent shortly. After the shooting, Adams decided to move with her daughter Rachel (who was not fathered by Landham) to the family farm in Kentucky. In early 1995, Adams spoke with Landham, and the two agreed to meet. Landham flew to Kentucky. Adams stated that Landham was "very, very nice," and that he indicated that he was no longer drinking.

In the spring of 1995, Adams and Landham agreed to shoot a motion picture together in Canada. Adams and her mother,

Glenda Adams, had inherited $100,000, which they invested in the film. Adams was the executive producer and Landham was the director. Adams described the film as a low-budget, erotic action adventure. Adams testified that Landham drank heavily during filming.

Landham and Adams also began seeing each other again. After the filming, while back on the farm in October 1995, Landham threatened Adams with a knife. Adams testified that Landham pointed the knife at her and stated, "if you want to push my buttons like O.J. did Nicole, you know, and then said that if you want to play Nicole, do you want me to play O.J." As a result, Adams obtained a Domestic Violence Order ("DVO") on October 31, 1995, which ordered Landham to have no contact with Adams. Landham did not contest the allegations. He immediately violated the DVO by making repeated phone calls.

Shortly thereafter, in November 1995, Adams became pregnant with Landham's child. On December 6, 1995, Adams moved to remove the first DVO in its entirety, stating that she and Landham "have a business relationship that requires daily communications and occasional business meetings." Adams married Landham in December 1995. Their daughter Priscilla was born on August 8, 1996.

On November 5, 1996, Adams obtained a second DVO when Landham told Adams' mother that if he had a gun, he would kill Adams. In addition, Landham threatened Adams by saying, "don't make me into a Butch Monroe, Jr.," a reference to a man who wrecked his car the night he and his girlfriend split up. Adams testified that Landham would make jokes about everything Monroe was going to do to the ex-girlfriend. Again, Landham failed to appear to contest these allegations. Adams also filed for divorce at this time.

Notwithstanding, on November 22, 1996, Adams entered into another agreed order of reconciliation, and also stopped the divorce action. One of the terms of the reconciliation order was that Adams would retain custody of Priscilla during the period of reconciliation.

votes on the merits of a case . . . . " *Ohio ex rel. Eaton v. Price*, 360 U.S. 246, 247 (1959); *Hicks v. Miranda*, 422 U.S. 332, 344 (1975) (quoting *Eaton*); *see also R.J. Reynolds Tobacco v. Durham County*, 479 U.S. 130, 139 n.7 (1986); 18 James Wm. Moore, et al., MOORE'S FEDERAL PRACTICE, § 134.04[5] (3d ed. 1999) ("The Supreme Court treats its own summary affirmance of an appeal from a three-judge district court as precedent to be followed.") We are therefore bound by the three-judge district holding in *Apollomedia*.

*Apollomedia* involved commercial communications, not purely private speech as in this case. However, because the statute bans only obscene speech, which is not protected, there is no impediment to applying it to purely private speech. *See Reno v. American Civil Liberties Union*, 521 U.S. 844, 878 n.44 (1997) (stating that its decision holding unconstitutional federal statute prohibiting "indecent transmission" over the Internet had no effect on laws prohibiting transmission of obscenity); *Roth*, 354 U.S. at 485 ("[O]bscenity is not within the area of constitutionally protected speech."). Therefore, we will assume for purposes of this case (because it ultimately makes no difference to the outcome here) that *Apollomedia* also applies to purely private interstate communications.[11]

Thus, the question becomes whether the speech is obscene. The Supreme Court in *Miller v. Cal.*, 413 U.S. 15 (1973), set forth the test to determine what is obscene. The Court stated that

[t]he basic guidelines for the trier of fact must be: (a) whether the 'average person, applying contemporary community standards' would find that the [statement], taken as a whole, appeals to the prurient interest . . . (b)

---

[11]We note that § 223(a) appears to apply to both private and public communications. Subsection (a) is entitled "Prohibited general purposes," and subsection (b) is entitled "Prohibited commercial purposes; defense to prosecution."

communications that are 'indecent' as opposed to only those that are 'obscene.'" *Id.* at 1084. The district court analogized the "string of words" in § 223(a)(1)(A) – "obscene, lewd, lascivious, filthy or indecent" – to the string of words used in 18 U.S.C. § 1461 – "obscene, lewd, lascivious or filthy" – which the Supreme Court in a line of cases read to proscribe only material containing "obscenity." *Id.* at 1090-92 (citing *Roth v. United States*, 354 U.S. 476 (1957); *Manual Enterpr., Inc. v. Day*, 370 U.S. 478 (1962); and *Hamling v. United States*, 418 U.S. 87 (1974)).[10]   The *Apollomedia* court also found significance in the fact that this interpretation prevailed at the time § 223(a)'s predecessor statute was enacted. *Id.* at 1089-90, 1092 (noting that it is an established rule of statutory construction that Congress is presumed to be thoroughly familiar with Supreme Court precedent and that it expects its enactments to be interpreted in conformity therewith). Finally, the court found that the legislative history was largely consistent with this view. *Id.* at 1092-96.

Pursuant to Section 561 of Pub. L. 104-104, an amendment to 47 U.S.C. § 223, Appollomedia filed a direct appeal to the Supreme Court, which affirmed without separate opinion. *See* 1998 WL 853216, *amended by* 526 U.S. 1061 (1999).

"Votes to affirm summarily, and to dismiss for want of substantial federal question, it hardly needs comment, are

---

[10]In *Roth v. United States*, 354 U.S. 476 (1957), the Supreme Court read the terms "obscene, lewd, lascivious or filthy" in 18 U.S.C. § 1461, which imposed criminal penalties for knowing use of the mails to transport "obscene, lewd, lascivious or filthy book, pamphlet, picture, patper, letter, writing, print or other publication of an indecent character," to refer solely to "obscenity." In *Manual Enterprises, Inc. v. Day*, 370 (1962), the Supreme Court reaffirmed this construction, observing that "[w]hile in common usage the words have different shades of meaning, the statute since its inception has been aimed at obnoxiously debasing portrayals of sex." *Id.* at 482-83. In *Hamling v. United States*, 418 U.S. 87 (1974), the Supreme Court rejected a vagueness challenge to § 1461, holding that the terms found in the serious of words were "limited to the sort of patently offensive representations or descriptions of that specific 'hard core' sexual conduct given as examples in *Miller v. California*." *Id.* at 130 n.7.

---

Adams obtained a third and final DVO on January 20, 1998. This DVO petition alleged that on January 7, 1998, Landham told Adams "that the children would be better off dead than having a psychotic mother," and that "cunts like you need a bullet between the eyes." Landham was removed from the home and ordered to have no contact. The third DVO states that Respondent "be restrained from any contact or communication with the above named Petitioner [Belita Landham]; [] by remaining at all times and places at least 500 feet away from petitioner and members of Petitioner's family or household." It awarded temporary custody of Priscilla to Adams, and ordered Landham to pay $60 a month in child support. Adams also filed for divorce again.

Adams testified that despite the DVO, Landham called and faxed her documents. She stated that he also faxed documents to a number of people in the community, including the elementary school principal, Adams' mother, and the court. In these documents he accused Adams of fraud and child abuse, among other things. Adams testified that Landham made numerous phone calls that lasted from January through June. She also stated that she did not know where Landham was living during this time.

Glenda Adams, Belita's mother, also obtained two DVOs against Landham, one in 1996 and another in 1998. These were also presented into evidence by the Government. In the first, Glenda Adams alleged that Landham told Glenda that he would shoot Belita if he had a gun. In the second, entered on May 12, 1998, Landham was ordered to have no contact with Glenda Adams.

On August 8, 1998, Priscilla's second birthday, a taxicab arrived with gifts from Landham. The store tags indicated that the presents were purchased locally. Landham was arrested on August 10, 1998, at his attorney's office in Kentucky. Adams did not actually see Landham again until the divorce hearing a few days later on August 13, 1998.

On August 26, 1998, a federal grand jury returned a four-count indictment against Landham. On October 21, 1998, a

six-count superseding indictment was returned. Landham was charged with (1) crossing state lines with intent to violate the terms of a domestic violence order, in violation of 18 U.S.C. § 2262 (Count One); (2) crossing state lines with intent to injure and harass, in violation of 18 U.S.C. § 2261A (Count Two); (3) knowingly transmitting in interstate commerce a threat to kidnap, in violation of 18 U.S.C. § 875(c) (Count Three); (4) knowingly transmitting in interstate commerce a threat to injure, in violation of 18 U.S.C. § 875(c) (Count Four); (5) transmitting interstate communications that were lewd, indecent, obscene, and lascivious with intent to abuse, harass, and annoy, in violation of 47 U.S.C. § 223(a) (Count Five); and (6) making repeated interstate telephone calls solely to harass, in violation of 47 U.S.C. § 223(A)(E) (Count Six).

Landham pleaded not guilty. Prior to trial, he moved, pro se, to "drop all charges." As grounds for his motion, Landham argued that (1) he was not subject to federal jurisdiction because he is a Kentucky resident and was entitled to drive in the state; (2) harassing phone calls "do not violate the federal law as written;" and (3) that his accuser is "a child abuser with severe mental problems, a perjurier [sic], and a convicted lier [sic]." The district court summarily overruled the motion.[2] Landham subsequently obtained counsel.

The Government filed a notice under Fed. R. Evid. 404(b) to introduce "prior bad acts" evidence. The Government sought to introduce prior DVOs, and testimony regarding their surrounding circumstances, Landam's discharging of a firearm in 1984, Landham's substance abuse problem, his conduct in a divorce proceeding, and his failure to pay child support. Landham objected to the 404(b) evidence, arguing that it was inadmissible character evidence. He also asserted

---

[2] Specifically, the district stated that "having considered Defendant's motion and the record, and being sufficiently advised; IT IS HEREBY ORDERED AND ADJUDGED: (1) that Defendant's pro se motion to "Drop All Charges" is OVERRULED."

### 3. Count Five

Count Five charged Landham with violating 42 U.S.C. § 223(a)(1)(A)&(B) for transmitting interstate communications between January 1998 and July 1998 that were lewd, indecent, obscene, and lascivious with intent to abuse, harass, and annoy. Section 223(a) makes it a crime to make, create, or solicit and initiate the transmission in interstate commerce "any comment, request, suggestion, proposal, image, or other communication which is obscene, lewd, lascivious, filthy, or indecent, with intent to annoy, abuse, threaten, or harass another person." 47 U.S.C.A. § 223(a) (West Supp. 2000). Landham argues that § 223(a) requires that the communication be "obscene"[8] and that the Government failed to establish this element. We agree on both fronts.

Our analysis of § 223(a) is controlled by *Apollomedia Corp. v. Reno*, 19 F.Supp. 2d 1081 (N.D. Cal. 1998), *aff'd,* 1998 WL 853216, *amended by* 526 U.S. 1061. The United States Supreme Court summarily affirmed the three-judge panel's[9] holding that 47 U.S.C. § 223 is limited to proscribing language that is "obscene," even though the plain language of the statute also prohibits communications which are "lewd, lascivious, or indecent." *Id.* at 1096.

The plaintiff, Apollomedia, challenged the constitutionality of § 223(a)(1)(A)(ii) and (a)(2) on the grounds that to the extent they prohibit "indecent" communications made "with an intent to annoy," they violated the First Amendment as vague and overbroad. The lower court characterized the issue as "whether § 223(a)(1)(A)(ii) and § 223(a)(2) proscribe

---

[8] It is well-settled that obscene speech is not protected by the First Amendment. *Roth v. United States*, 354 U.S. 476, 485 (1957).

[9] Pursuant to 28 U.S.C. § 2284 and § 561(a) of the Communications Decency Act, 47 U.S.C. § 561(a), a district court of three judges shall be convened when the constitutionality of any provision of the CDA is challenged.

Landham had ever attempted to remove Priscilla from the family residence. Most significantly, Adams did not call the police after she received this call, despite the fact that she had an enforceable order banning Landham from all communication, and the fact that, in the past, she did not hesitate to seek police protection when she was allegedly afraid of Landham. Thus, the evidence reveals that Adams herself did not perceive the February 7, 1998 communication as a true threat to kidnap. In other words, a rational trier of fact could not have found Landham guilty of this count. The district court erred in failing to grant Landham's motion for judgment of acquittal as to this count.

### 2. Count Four

As discussed above, the statement at issue in Count Four is not a threat and should have been dismissed on Landham's motion. Notwithstanding, the Government argues that, taken in context, the statement was clearly a threat because Adams testified that Landham often got his tenses jumbled when he was drunk. This argument is unavailing. First, it does not communicate an intent to inflict bodily harm. Second, Adams herself testified that Landham had libeled her, by transmitting documents disparaging her to members of the community.[7] She therefore could not have reasonably construed the statements at issue in Count Four as anything other than a reference to what Landham had *already* done to her, on *paper*.

---

[7] This conclusion is reinforced by a phone call placed prior to the one at issue in Count Four, where Landham stated: "Oh, I forgot to tell you, when you take Rachel to school tomorrow, know that Linda Breeze and Ed Applegate know all about you. They know your arrests records and, uh, your lying to the insurance company and your attempt to defraud, so, you know, your prostitution charges and everything else and you know, ah, what happened in Beverly Hills . . . ." (J.A. 64.)

that the firearms evidence was not substantially similar and too distant in time from the charged conduct. After an evidentiary hearing, the district court summarily overruled Landham's objections to the Government's 404(b) evidence, except as to the discharging of a firearm, which it initially took under advisement. The district court later entered an order overruling Landham's objection to the firearms evidence.

At trial, the Government introduced the foregoing bad acts evidence, as well as tapes of approximately fifty phone calls Landham placed to Adams between January and June 1998. The exact dates and times of all Landham's calls were unknown. However, receipts found in Landham's vehicle established that, between January 1998 and June 1998, he traveled from Kentucky to Georgia, Illinois, Indiana, and back to Georgia. In addition, on two occasions during this period, he left a Chicago, Illinois telephone number. More importantly, Agent Yvonne Warner, who interviewed Landham, testified that Landham told her that after he left Kentucky on January 8, 1998, he traveled to Atlanta, Georgia; Chicago, Illinois; Kansas City, Missouri; back to Atlanta, and then to Kentucky on August 7, 1998.

At the close of the evidence and after the defense rested, Landham moved for judgment of acquittal as to all six counts. The trial court granted Landham's motion as to Count Six and denied his motion as to the other counts. The jury convicted Landham of Counts Three, Four, and Five. The jury failed to reach a verdict on Counts One and Two, and the trial court granted a mistrial as to these two counts. The district court later sentenced Landham to a term of forty-one months' imprisonment.

Landham's timely appeal follows.

### III. Analysis

### A. Motion to Dismiss

In his first issue on appeal, Landham argues that the district court should have granted his motion to dismiss Counts Three and Four on the grounds that his statements were not "true threats," and therefore were protected speech. Landham does not indicate in his appellate brief where this issue was raised below. The Government does not bother to address the threshold preservation question, much less the merits of the issue. Yet the record reveals that Landham, prior to obtaining counsel, filed a motion to "drop all charges," in part on the grounds that harassing phone calls "do not violate the federal law as written." Furthermore, the district court ruled on the merits of the motion. Given the liberality with which we construe pro se pleadings, we hold this issue was preserved, and we now address it. *See generally Williams v. Browman*, 981 F.2d 901, 903 (6th Cir. 1992) (per curiam).

In general, an indictment is constitutionally adequate[3] if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974); *United States v. Maney*, 226 F.3d 660, 663 (6th Cir. 2000); *United States v. Monus*, 128 F.3d 376, 388 (6th Cir. 1997).[4]

---

[3] The Notice Clause of the Sixth Amendment requires that a criminal defendant has the right "to be informed of the nature and cause of the accusation" against him. U.S. Const. amend. VI.; *United States v. Maney*, 226 F.2d 660, 663 (6th Cir. 2000). Further, the Indictment Clause of the Fifth Amendment requires that a defendant be charged with only those charges brought before the grand jury. U.S. Const. amend. V.; *Maney*, 226 F.3d at 663.

[4] As Professors LaFave, Israel, and King have observed, "the *Hamling* standard actually includes three requirements: (1) inclusion of the elements of the offense; (2) providing adequate notice as to the charge; and (3) providing protection against double jeopardy." Wayne R.

(assuming he could communicate one as a matter of law). Viewed in context, it is clear that Landham's communication in Call #10 (the one at issue in Count Three) refers to the imminent custody battle over Priscilla. For example, in Call #21, Landham stated:

> You are an unfit mother. You're going to lose Rachel Gail as well as Priscilla. You better talk to me now. How far do you want to carry the game? You're losing Priscil, uh, Rachel, you're gonna uh, losing Belita, you're going to lose Priscilla and you're going to lose Rachel. *They're going to take them away from you and they're going to convict you* so you just watch out. (Emphasis added.)

Significantly, Landham does not state that *he* is going to take Adams' children away, but refers to third parties, a body empowered with the legal power to "convict" Adams. Landham is obviously referring to legal entities, with the power to take away custody as well as to charges Adams will illusory crimes.

Even if this conclusion were not obvious, Call #22, the basis for Count Four, clinches it. There, Landham remarked:

> I am talking to the sheriff. They know what's happening. I'm talking to the Highway Patrol. *You're going to lose custody* of Rachel as well as Priscilla. (Emphasis added.)

Further, in Call #10, Landham also stated, "You ain't going to have Priscilla to raise and I'm coming to get her. *I'm making money*." (Emphasis added.) Here, Landham's reference to money suggests his ability to pursue his custody rights with Priscilla.

In short, review of Landham's phone calls demonstrates that Landham was referring to an imminent custody battle. As noted, Landham was the biological father of Priscilla, and as such had a legal right to custody of her. The January 20, 1998 DVO granted only temporary custody of Priscilla to Adams. Moreover, there was no evidence or allegation that

Count Three was a transmission in interstate commerce and that it was a "true threat."

### a. Interstate Transmission

The Government was required to prove that Landham made the call outside the state of Kentucky. According to the Indictment, the statement in Count Three was made on or about February 7, 1998. Agent Warner testified that Landham told her that after January 8, 1998, when the third and final DVO was entered against him, he got a ride to the bus station in Lexington, Kentucky. From there he rode by bus to Atlanta, Georgia, to visit his parents, where he remained from seven to ten days. Warner testified that Landham told her that he next traveled to Chicago, then on to Indianapolis, and then to Kansas City at the end of May. In short, although not direct evidence, we think the Government sufficiently established through circumstantial evidence that Landham was not in the state of Kentucky when he placed the call on February 7, 1998 to Adams.[6] Viewed in the light most favorable to the Government, we find that it presented sufficient evidence for any juror to find that the first element of § 875(c) was met.

### b. True Threat

Landham also asserts that the statement in Count Three was not a "true threat." As indicated, the district court erred in not dismissing this count because it fails as a matter of law to state a violation of § 875(c). In any event, we find that no rational trier of fact could find, beyond a reasonable doubt, that Landham communicated a true threat to kidnap

---

[6] At trial the Government introduced an exhibit plotting out Landham's route between January 7, 1998 and August 6, 1998, based upon receipts recovered from Landham's vehicle. There is no clear evidence that Landham was not in the state of Kentucky on February 7, 1998. The only proof is that on January 12, 1998, Landham departed Lexington, Kentucky for Atlanta, Georgia. There is no other entry until April 1, 1998, for an ATM receipt in Chicago, Illinois.

However, it is axiomatic that, "[t]o be legally sufficient, the indictment must assert facts which in law constitute an offense; and which, if proved, would establish prima facie the defendant's commission of that crime." *United States v. Superior Growers Supply, Inc.*, 982 F.2d 173, 177 (6th Cir. 1992) (citing *Fleisher v. United States*, 302 U.S. 218 (1937)) (per curiam); *cf. Hamling*, 418 U.S. at 117 (stating that an indictment is sufficient if it "set[s] forth the offense in the words of the statute itself, as long as those words . . . fully, directly, and expressly . . . set forth all the elements necessary to constitute the offense intended to be punished."(citations omitted)). An indictment is usually sufficient if it states the offense using the words of the statute itself, as long as the statute fully and unambiguously states all the elements of the offense. *Hamling,* 418 U.S. at 117; *Monus*, 128 F.3d at 388. At the same time, the Supreme Court has cautioned: "Undoubtedly the language of the statute may be used in the general description of the offense, *but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense*, coming under the general description, with which he is charged." *Hamling*, 418 U.S. at 117-18 (quotation marks omitted) (emphasis added).

Further, courts evaluating motions to dismiss do not evaluate the evidence upon which the indictment is based.

---

LaFave, et al., 4 CRIMINAL PROCEDURE, § 19.2(a), at 746 (1999). They have also noted that the first requirement, known as the "essential elements" requirement,

> is based primarily upon a third pleading function, sometimes characterized as the "judicial review" function. That function has been described by the Supreme Court as "inform[ing] the [trial] court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had. Although this "judicial review" function is mentioned far less frequently than the "notice and "double jeopardy" functions, it remains a cornerstone of both federal and state pleading requirements.

*Id.* § 19.2(d), at 753-54 (citing *United States v. Cruikshank*, 92 U.S. (2 Otto) 542, 558, 23 L.Ed. 588 (1876)) (footnotes and citations omitted).

*See Costello v. United States*, 350 U.S. 359, 362-63 (1956); *United States v. Powell*, 823 F.2d 996, 999-1001 (6th Cir. 1987); *United States v. Markey*, 693 F.2d 594, 596 (6th Cir. 1982) (stating that the "validity of an indictment is not affected by the type of evidence presented to the grand jury, even though that evidence may be incompetent, inadequate or hearsay"); *United States v. Short*, 671 F.2d 178, 182 (6th Cir. 1982) (stating that criminal cases should not be "further attenuated by preliminary trials concerning the adequacy of grand jury proceedings, a concern particularly noted in *Costello*" (quotation marks omitted)). However, applying this principle to § 875(c) is problematic, because the alleged threatening statement must be viewed from the objective perspective of the recipient, which frequently involves the context of the parties' relationship. For this reason, it is incumbent on the Government to make that context clear in such an indictment, unless the alleged threat is direct.

Whether the elements of the offense are adequately alleged in the indictment is a legal question subject to de novo review. *Superior Growers*, 982 F.2d at 177; *Maney*, 226 F.3d at 663. If the indictment is legally deficient, the proper result is dismissal of the indictment. *Superior Growers*, 982 F.2d at 177; *cf. United States v. Alkhabaz*, 104 F.3d 1492, 1493 (6th Cir. 1997) (concluding that the indictment failed, "as a matter of law," to allege violations of § 875(c); affirming dismissal of indictment).

Both Counts Three and Four arose under 18 U.S.C. § 875. Section 875(c) makes it a crime to "transmit[] in interstate commerce any communication containing any threat to kidnap any person or any threat to injure the person of another." 18 U.S.C.A. § 875(c) (West 2000). This Court has held that § 875(c) contains three elements: "(1) a transmission in interstate commerce; (2) a communication containing a threat; and (3) the threat must be a threat to injure [or kidnap] the person of another." *United States v. DeAndino*, 958 F.2d 146, 148 (6th Cir. 1992). We have defined "communication containing a threat," the second element, in the following manner:

This statement is not a "communication containing a threat." Landham's statement "I *have done* more to you with a Parker fifty-one than your, than your, well, than what happened to your father with a goddamn Taurus five shot," (emphasis added), refers to past conduct, not present or future conduct. Furthermore, even if the statement were a veiled threat, it was not an intent to inflict bodily harm. A Parker fifty-one is a fountain pen. Although the statement is obscure and also references a gun, it is self-evident that Landham is referring to damaging remarks he had previously made by transmitting written communications. Stated differently, there is simply no communication which "a reasonable person . . . would take . . . as a serious expression of an intention to inflict bodily harm." *Alkhabaz*, 104 F.3d at 1495.

Because the indictment failed, as a matter of law, to allege a violation of § 875(c), the district court erred in denying Landham's motion to dismiss Count Four. Nonetheless, given the difficulty in analyzing these types of counts absent context, and the procedural confusion caused by the parties and the lower court, we will also address these issues in the next section.

### B. Motion for Acquittal

Landham argues that the district court erred in denying his motion for acquittal as to Counts Three, Four, and Five. In reviewing the denial of a motion for acquittal, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

### 1. Count Three

Even if Count Three were proper on its face, Landham's motion for judgment of acquittal on Count Three should have been granted. We therefore discuss his arguments that the Government failed to establish that the statement at issue in

officials. The penalty provision also provides lesser sanctions for commission of this offense by a relative as defined in KRS 509.010.

Ky. Rev. St. Ann. § 509.060 (Banks-Baldwin 2000), Commentary.

Nor could Landham's alleged conduct be a violation of federal law. *See* 18 U.S.C.A. § 1201(g) (West 2000) (parent exemption to federal kidnapping statute); *United States v. Sheek*, 990 F.2d 150, 151-53 (4th Cir. 1993) (holding that parent exemption to federal kidnapping statute applies to biological parent whose parental rights have been permanently terminated). Thus, had Landham removed Priscilla, he may have been in violation of the DVO, but not the Kentucky kidnapping statute or the Federal Kidnapping Act. Therefore, if Landham was legally incapable of kidnapping Priscilla, he could not legally make a threat to kidnap.

In sum, because it is missing two of the three essential elements of a § 875(c) claim, a communication containing a threat, and a threat to kidnap, this count fails as a matter of law and should have been dismissed.

### 2. Count Four

Count Four alleges:

On or about a date in March or April, 1998 the exact date unknown to the Grand Jury,

#### WILLIAM M. LANDHAM

defendant herein, did knowingly transmit in interstate commerce a threat to injure another person, in that by interstate phone call he stated to Belita Landham words to the effect "It's over kid. Are you an idiot? I've done more to you with a Parker 51 than what happened to your father with a goddamn Taurus five-shot"; all in violation of Title 18, United States Code, Section 875.

---

a communication must be such that a reasonable person (1) would take the statement as a serious expression of an intention to [kidnap or] inflict bodily harm (the mens rea)[;] and (2) would perceive such expression as being communicated to effect some change or achieve some goal through intimidation (the actus reus).

*Alkhabaz*, 104 F.3d at 1495.[5] Both the mens rea and the actus reus must be determined objectively, from the perspective of the receiver. *Id.* at 1496.

Finally, it is well established that true threats, unlike political hyperbole and other protected speech, are not protected by the First Amendment. *Watts v. United States*, 394 U.S. 705, 708 (1969) (per curiam). On the other hand, speech that is vulgar or offensive is protected. *See Sable Communications v. FCC*, 492 U.S. 115 (1989); *Cohen v. California*, 403 U.S. 15 (1971).

### 1. Count Three

Count Three alleges:

On or about a February 7th, 1998, in Lewis County, in the Eastern District of Kentucky,

#### WILLIAM M. LANDHAM

defendant herein, did knowingly transmit in interstate commerce a threat to kidnap another person, in that by interstate phone call he stated to Belita Landham words to the effect: "I'm going to tell you something you . . . . You will not have Priscilla by her second birthday,

---

[5]In arguing that his statements were not "true threats," Landham relies on *United States v. Kelner*, 534 F.2d 1020 (2d Cir. 1976), for the proposition that a threat under § 875(c) must be "so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." *Id.* at 1027. This standard differs from the rule in this Circuit, as set forth in *Alkhabaz,* and we decline to apply it.

because I'm going to have all your children . . . . You will not have Priscilla to raise. . . I'm going to get her,"; all in violation of Title 18, United States Code, Section 875.

The district court erred in failing to dismiss Count Three. This statement contains no communication containing a direct threat to kidnap, nor would a reasonable observer in Belita Adams' shoes perceive it as an indirect threat. This is especially so given that, just one month earlier, Adams had obtained a DVO removing Landham from the home, barring him from contact with his daughter, and granting temporary custody to Adams. She had also filed for divorce. Thus, custody of Priscilla obviously would be an issue in the divorce proceeding, especially since Landham had repeatedly accused Adams of child abuse. Landham's statement, "I'm going to get her," in context, refers to a custody battle during the divorce proceeding. Moreover, there was no allegation that Landham had ever attempted to abduct Priscilla in the past.

More fundamental is the fact that Landham could not legally be charged with kidnapping under state or federal law in the first place so that the third element of § 875(c) is not met. Priscilla is the biological daughter of Landham, and his parental rights had not been terminated. The January 1998 DVO merely granted Adams temporary custody of Priscilla.

A person is not guilty of kidnapping under Kentucky law unless he "unlawfully restrains another person *and* when his intent is":

(a) To hold him for ransom or reward; or
(b) To accomplish or to advance the commission of a felony; or
(c) To inflict bodily injury or to terrorize the victim or another; or
(d) To interfere with the performance of a governmental or political function; or
(e) To use him as a shield or hostage.

Ky. Rev. Stat. Ann. § 509.040 (Banks-Baldwin 2000). Furthermore, "it is a defense [to kidnapping under Ky. Rev. Stat. Ann. § 509.040] that the defendant was a relative of the victim and his sole purpose was to assume custody of the victim." Ky. Rev. St. Ann. § 509.060 (Baldwin 2000). At best, Landham could only be charged with "custodial interference" under Ky. Rev. St. Ann. § 509.070(1) ("A person is guilty of custodial interference when, knowing that he has no legal right to do so, he takes . . . [a] person entrusted by authority of law to the custody of another person." As the commentary makes clear

The combined effects of KRS 509.060 and 509.070 are: to render the statutes on unlawful imprisonment and kidnapping inapplicable to situations involving the acquisition of control over another because of familial affection or considerations, and to create a special offense to deal with conduct involving an interference with lawful custody. While eliminating the possibility of child custody disputes constituting unlawful imprisonment or kidnapping, these provisions reflect a judgment that there exists a need to protect "parental custody against all unlawful interruption, even when the child itself is a willing, undeceived participant in the attack on this interest of its parent." Model Penal Code § 212.4, Comments (Tent. Draft No. 11, 1960). . . . Because of the fact that most cases to arise under this statute will involve custodial disputes in domestic relations situations, a special defense is provided for a defendant who relinquishes his wrongful custody prior to the initiation of the criminal process through arrest or the issuance of a warrant.

The penalty structure for the offense of custodial interference is designed to encourage an offender to return his victim to lawful custody on his own even though the defense mentioned above is unavailable to him. A "voluntary" return, within the contemplation of this provision, is one that is not stimulated by a threat of immediate apprehension or detection by law enforcement