RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2004 FED App. 0178P (6th Cir.)
File Name: 04a0178p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

No. 02-4086

ERIK BOWKER,
*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 01-00441—John M. Manos, District Judge.

Submitted: March 10, 2004

Decided and Filed: June 11, 2004

Before: MARTIN and CLAY, Circuit Judges; MILLS,
District Judge.[*]

---

**COUNSEL**

**ON BRIEF:** Jay Milano, MILANO & CO., Rocky River,
Ohio, for Appellant. Edward F. Feran, ASSISTANT

---

[*] The Honorable Richard Mills, United States District Judge for the
Central District of Illinois, sitting by designation.

UNITED STATES ATTORNEY, Cleveland, Ohio, for
Appellee.

---

## OPINION

---

CLAY, Circuit Judge.    Defendant-Appellant Erik S.
Bowker appeals his convictions and sentence for one count of
interstate stalking, in violation of 18 U.S.C. § 2261A(1); one
count of cyberstalking, in violation of 18 U.S.C. § 2261A(2);
one count of theft of mail, in violation of 18 U.S.C. § 1708;
and one count of telephone harassment, in violation of 47
U.S.C. § 223(a)(1)(C).    Bowker also appeals the district
court's failure to rule on his motion to return seized property
and the district court's enhancement of his sentence based on
extreme psychological harm to the victim.    For the reasons
that follow, we **AFFIRM** Bowker's convictions and sentence,
but **REMAND** to the district court for a ruling on Bowker's
motion to return seized property.

### I
### Facts

**A.   Procedural History**

On August 28, 2001, United States Magistrate Judge
George J. Limbert signed a criminal complaint charging Erik.
S. Bowker ("Bowker") with one count of telephone
harassment in violation of 47 U.S.C. § 223(a)(1)(C). Bowker
was arrested on August 29, 2001.    On September 7, 2001, the
magistrate judge held a preliminary examination and
detention hearing for Bowker.    The magistrate judge
determined that probable cause for Bowker's arrest had been
established, and he ordered Bowker detained.

On September 25, 2001, a federal grand jury returned a
four-count indictment against Bowker. Bowker was charged

with one count of interstate stalking, in violation of 18 U.S.C. § 2261A(1); one count of cyberstalking, in violation of 18 U.S.C. § 2261A(2); one count of theft of mail, in violation of 18 U.S.C. § 1708; and one count of telephone harassment, in violation of 47 U.S.C. § 223(a)(1)(C).

Bowker filed several pretrial motions which are the subject of this appeal – a *pro se* motion to represent himself, a motion to dismiss Counts 1, 2, and 4 of the indictment, a motion to sever Count 3 from the indictment, a motion to suppress evidence, and a *pro se* motion for return of seized property and items, pursuant to Rule 41 of the Federal Rules of Criminal Procedure. The district court denied all of the foregoing motions, except for the motion to return seized property, on which the district court never ruled. On March 26, 2002, after the denial of Bowker's *pro se* motion to represent himself, Bowker's counsel moved to withdraw from the case, and Bowker signed a separate statement asking the court to grant the motion and assign him new counsel. The district court granted the motion and assigned Bowker new counsel.

Bowker's jury trial commenced on June 3, 2002. On June 6, 2002, the jury returned verdicts of guilty against Bowker on all counts. On September 5, 2002, the government moved for an upward departure from the sentencing guidelines based on the victim's extreme psychological harm. On September 10, 2002, the district court sentenced Bowker to 96 months' incarceration, three years of supervised release, and a $400 special assessment. In assessing the term of incarceration, the district court granted the government's motion for an upward departure.

## B.  Substantive Facts

In March, 2000, Tina Knight began working as a part-time general assignment reporter at WKBN Television in Youngstown, Ohio. WKBN has a general email account for most employees, and in June, 2000, WKBN received a number of emails relating to Knight. The emails were sent from several different email addresses and purported to be from an individual variously identified as "User x," Eric Neubauer, Karen Walters, and "BB." Several of the emails attached photographs with verbal captions. One caption referred to Knight being shot with a pellet gun, and another email said, "Thanks for my daily Tina Knight fix. Thanks for helping me get my nuts off," and another said "More Tina Knight, that is what I want and need." After receiving approximately nine of these types of email, WKBN's news director took them to the station's general manager. They then contacted Special Agent Deane Hassman of the FBI. Soon thereafter, Knight was shown the emails, and she was stunned and frightened.

FBI Agent Hassman began investigating the Tina Knight emails in July, 2000. Hassman was concerned about Knight's personal safety based on the content of the emails. One of the emails that concerned Hassman stated, "I'm not the type of obsessed viewer that hides in the bushes near your home to watch you come home from work, but we shall see. That may actually be fun." Another disturbing email stated, in part, "Dear Ms. Knight. Now I'm really pissed that you were looking even cuter than normally. You fucked up a little bit and here I am watching on this black and white thrift store TV. Cute, cute, cute. I bet you were a Ho at Ohio University in Athens, doing chicks and everything. Wow."

On July 25, 2000, Hassman sent emails to the various email addresses on the correspondence pertaining to Knight. Hassman asked the sender of the emails to contact him so that he could determine the sender's intent. Within 24 to 48 hours, Hassman received a telephone call from an individual who identified himself as Erik Bowker. Hassman wanted to set up a meeting with Bowker so Hassman could positively identify the sender of the emails and also ask him to cease and desist from contacting Knight. They arranged to meet at the public library in Youngstown, but Bowker never showed.

A few weeks later, Knight began receiving hand-written notes at WKBN, the majority of which were signed by "Doug Wagner." By September, the letters were arriving at the station almost every couple of days. One of the letters included the phrase, "All this week I will be playing the role of Doug Wagner." A letter dated August 9, 2000 was signed "Chad Felton"; stated, "I think you are a super babe"; and included a necklace. The return addresses on the letters were one of two P.O. Boxes registered to Erik Bowker or his mother.

Knight left her employment at WKBN in November, 2000 to take a position at WOWK CBS13 in Charleston, West Virginia. WKBN did not inform the general public of Knight's new location.

In late December, 2000, Knight's parents, who reside in Medina, Ohio, received a card and a handwritten note at their home. The card purported to be from "Kathryn Harris." The letter read, "Dear Tina Knight: I am Kathryn Harris today. I didn't want your parents asking you a lot of questions, nor did I want to attract a lot of attention to you. My letters to you are all online at yahoo.com in a standard mail account. It is all explained there so please check in and read what I have written…. The E-mail address is tinahatesme@yahoo.com." Agent Hassman visited the email address to check if any letters had been sent to the email address mentioned in the letter. Hassman discovered that an email had been sent December 25, 2000. At the end of the email, the name "Doug Wagner" was typed. The email read, in part, "I told you I would not contact you by mail anymore but I am sorry, I am in agony. I'm thinking about you all the time. You really are my dream girl…. I am blinded with affection for you. I did not ask for this. Nope, it's all your fault…. Please don't cat dance on my emotions by failing to respond to me at all."

In February, 2001, Bowker filed a lawsuit against Knight in the Mahoning County Common Pleas Court. Knight's social security number was stated in the complaint, which was

served at Knight's home address in West Virginia. Bowker's lawsuit accused Knight of stalking him. Agent Hassman attended a status conference for the lawsuit on March 16, 2001, so that he could make face-to-face contact with Bowker. After meeting Bowker at the hearing and confirming that Bowker had been sending the unsolicited correspondence to Knight, Hassman told Bowker that the correspondence was unwelcome and might be a violation of federal law. Hassman advised Bowker that if the conduct continued, it might result in his arrest. Bowker responded that he had a First Amendment right to engage in that type of conduct. Nevertheless, during the meeting, Bowker wrote and signed a note stating, "I understand that Tina M. Knight wishes all further contact with her or any family member to stop and I agree to do so, pursuant to conversation with Deane Hassman, special agent, Federal Bureau of Investigation …." Bowker also agreed to voluntarily dismiss his lawsuit against Knight.

Despite Bowker's March, 16, 2001 agreement to cease and desist from any further contact with Knight, on that very same day, Bowker mailed a letter to Knight. Bowker also continued to attempt telephone contact with Knight. Between January 26 and August 29, 2001, Bowker made 146 telephone calls from his cell phone to WOWK CBS 13, where Knight worked. Bowker also made 16 calls to Knight's personal residential telephone in West Virginia between August 11 and 28, 2001. Knight's number was unlisted and unpublished. According to telephone records, each of the 16 calls placed to Knight's home were preceded by *67, which enables a caller to block identification of his telephone number on the recipient's caller identification display. Bowker also called Knight's co-worker and a neighbor.

As the telephone calls to Knight's television station persisted through the summer of 2001, Agent Hassman believed it was important to capture Bowker's voice on tape, so Hassman provided Knight with a recording device at the television station. On June 12, 2001, Knight recorded a 45

minute telephone call from Bowker who, at one point, identified himself as "Mike." During the conversation, Bowker referred to Knight's neighbors, her family members and her social security number. He also indicated he might be watching Knight with his binoculars. Knight provided the tape to the FBI and never spoke to Bowker again on the telephone.

On July 16, 2001, Knight received a letter at the television station. In the letter, Bowker referred to Knight's parents and stated several times, "You do not hang up on me." The letter also crassly referred to Knight's car, threatened to file a mechanic's lien on her car and her co-worker's car, accused Knight and her colleague of being "fuck-ups, assholes and seriously emotional and mentally unbalanced," and contained numerous sexual references. The letter stated that Bowker would be contacting Knight's neighbors, pointed out that Knight had not registered her car in West Virginia, and concluded with the words, "So bye-by, fuck you, you are an asshole and a sociopath and an embarrassment to mothers everywhere sir…. Adios, Eric…. Smooch, Smooch."

On August 10, 2001, Knight received a certified letter mailed to her residence in West Virginia. Accompanying the letter were numerous photographs of Bowker at various locations in West Virginia, Knight's home state. The letter stated, in part, "Send me an E-Mail address. It keeps me long distance, you know what I mean." Knight forwarded the letter and the photographs to the FBI. Bowker's credit card statement later revealed purchases from a Kmart and a Kroger near Knight's place of employment and residence in West Virginia between June 12 and July 30, 2001.

In August 2001, Bowker left a series of messages on Knight's answering machine asking that Knight or Knight's friend call him back, which did not occur. Among other things, Bowker stated:

I don't even know why I'm nice to you ever at all, you and your fucked-up friend should not even be working in the media. You know you gotta mother-fucking realize there's like 50 percent men in this country and you better mother-fucking learn that you're going to have to deal with us sometime.…

Well, it looks like nobody is going to answer me if Tina Knight is okay, so I'm gonna take the 1:00 a.m. bus out of Columbus, Ohio and come down there and see for myself. Okay, I'll be there about 6:00 a.m. Bye.

Knight testified that these messages made her afraid to leave the house everyday, and she feared that Bowker might try to rape her. She gave the answering machine recordings to the FBI.

Bowker was arrested on August 29, 2001 at a self-storage facility in Youngstown where he kept some of his possessions. Among other things recovered from the storage facility, Bowker's car and other locations, were a police scanner set to the frequency of the Youngstown Police Department, a paper with scanner frequencies from the Dunbar, West Virginia Police Department, letters bearing the name "Chad Felton," a credit report for Tina Knight, Knight's birth certificate, a map of Dunbar, West Virginia, Greyhound bus schedules with West Virginia routes, and photos taken by Bowker during a West Virignia trip on July 11, 2001, which included pictures of Knight's place of work, her car and CBS news trucks. The FBI also discovered that Bowker had in his possession a Discover Card credit card bill addressed to Tina Knight in West Virginia. Knight never received that statement in the mail.

## II
## Probable Cause for Bowker's Arrest

Bowker argues that the magistrate judge erroneously found that there was probable cause to issue a warrant for his arrest premised on an alleged violation of 47 U.S.C.

§ 2223(a)(1)(C), which prohibits telephone harassment. He further argues that trial court committed the same error when it denied Bowker's motion to suppress evidence obtained through the arrest warrant. We reject Bowker's arguments for the reasons stated below.

## A.  Standard of Review

The Court considers the evidence that the warrant-issuing magistrate judge had before him only to ensure that the magistrate had a substantial basis for concluding that probable cause existed. *See United States v. Jones,* 159 F.3d 969, 973 (6th Cir. 1998) (citing *Illinois v. Gates,* 462 U.S. 213, 238-39 (1983)). The Court defers to findings of probable cause made by a magistrate, and will not set aside such findings unless they were arbitrarily made. *United States v. Brown,* 147 F.3d 477, 484 (6th Cir. 1998). When reviewing a district court's denial of a motion to suppress, the Court reviews the district court's findings of fact for clear error and its conclusions of law *de novo*. *Id.*

## B.  Analysis

At the preliminary hearing, the government brought a one-count criminal complaint against Bowker for the crime of telephone harassment, in violation of 47 U.S.C. § 223(a)(1)(C). That section provides for a fine, imprisonment, or both for anyone, who in interstate or foreign communications:

> makes a telephone call or utilizes a telecommunications device, whether or not conversation or communication ensues, without disclosing his identity and with intent to annoy, abuse, threaten, or harass any person at the called number or who receives the communications.

47 U.S.C.A. § 223. Incorporated into the criminal complaint was the affidavit of FBI Agent Deane Hassman, who alleged that Bowker had made numerous telephone calls to Tina

Knight in which Bowker did not identify himself, including a conversation with Knight on June 12, 2001, and messages left on Knight's answering machine on August 17-19 and 25-26, 2001. Agent Hassman's affidavit also provided extensive background details on Bowker's campaign of harassment against Knight via emails, letters and telephone calls.

Bowker concedes that the magistrate judge could have found probable cause on the elements of using the telephone with the intent to annoy, abuse, threaten or harass. He argues, however, that the magistrate had no basis to find the element of failing to disclose identity during the telephone calls because Knight, the recipient of those calls, allegedly recognized his voice, making it unnecessary for him to state his name. *See* J.A. 581 (testimony of Agent Hassman: "There came a point in time where Tina [Knight] began to recognize a certain voice on the phone, which she believed to be Eric [sic] Bowker."). Bowker points to the fact that during the June 12, 2001 telephone conversation with Knight, she referred to Bowker as "Eric" [sic].

Bowker's argument is flawed in several respects. His argument does not address the numerous occasions when Bowker called Knight and no conversation ensued and no messages were left or her answering machine. The evidence before the magistrate showed that Bowker used a caller identification blocking feature (*67) to place these calls, thereby concealing his identity. Since the telephone harassment law prohibits calls made with the intent to harass or annoy "whether or not conversation or communication ensues," there was probable cause to find that Bowker had concealed his identity in those instances. Knight's alleged ability to identify Bowker's voice was irrelevant.

Bowker responds that his use of the *67 feature should be legally irrelevant, since it penalizes him for placing telephone calls to numbers with a caller identification service. He contends that criminal liability should not hinge on what telephone features a person pays for each month to the local

phone company. Bowker, however, is not being penalized based on the telephone features to which his victim subscribed, but for using the *67 feature in conjunction with his intent to annoy or harass Knight. Had he lacked that intent, no criminal liability would have attached.

Even assuming that Knight was able to identify Bowker's voice, the magistrate judge properly found probable cause to believe that Bowker had not disclosed his identity during the June 12, 2001 conversation in which he mis-identified himself as "Mike" and in August, 2001, when he left messages on Knight's answering machine without providing any name at all. On its face, the telephone harassment statute makes it illegal to place a call, with the intent to annoy, abuse threaten or harass, whenever the caller fails to identify himself. Since Bowker concedes that the magistrate judge could have found probable cause that he had the requisite intent, it was Bowker's provision of a false name and/or his failure to identify himself – not an erroneous judicial determination about the victim's recognition of his voice – that led to the issuance of his arrest warrant.

Bowker similarly argues that the district court, which supervised the trial proceedings, erred in denying his motion to suppress evidence derived from his arrest for telephone harassment. In addition to his argument that the evidence did not support a finding of probable cause to believe that Bowker had failed to disclose his identity (discussed above), Bowker argues that the district court erred in ruling that FBI agent Hassman did not intentionally mislead or omit crucial material facts in his affidavit supporting probable cause. Bowker argues that he showed, by a preponderance of the evidence, materially false representations and omissions by Agent Hassman, and that absent those misrepresentations, probable cause would not have been found.

To prevail on a motion to suppress based on allegations of intentional misrepresentation by a law enforcement officer in the course of obtaining an arrest warrant, Bowker must

establish (1) the allegation of perjury or reckless disregard "by the defendant by a preponderance of the evidence" and (2) "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, [such that] the search warrant must be voided and the fruits of the search' suppressed." *United States v. Graham,* 275 F.3d 490, 505 (6th Cir .2001) (quoting *Franks v. Delaware,* 438 U.S. 156, 155-56 (1978)). Bowker has not established that Agent Hassman perjured himself in his affidavit in support of the criminal complaint or at the suppression hearing. At most, he quibbles with Hassman's characterization of Bowker's letters and emails as sexual and threatening. Hassman's characterization, however, largely is a matter of opinion, and the content of Bowker's communications speak for themselves. Thus, there is no indication that the magistrate judge was misled in reaching its probable cause finding. Accordingly, the district court did not err in denying Bowker's motion to suppress evidence.

## III
## Motion to Dismiss Counts 1, 2 and 4 of the Indictment

Bowker argues that the district court erred in failing to dismiss Counts 1 (interstate stalking), 2 (cyberstalking) and 4 (telephone harassment) of the indictment on the ground that the indictment inadequately alleged the elements of the offenses charged, and on the ground that the statutes that the indictment alleged he violated are unconstitutionally vague and overbroad. We review the denial of a motion to dismiss *de novo. United States v. Maney,* 226 F.3d 660, 663 (6th Cir. 2000). For the reasons that follow, we affirm the decision of the district court.

### A.   Sufficiency of the Indictment

Under the Notice Clause of the Sixth Amendment, a criminal defendant has the right "to be informed of the nature and cause of the accusation" against him. U.S. CONST. amend. VI. In addition, the Indictment Clause of the Fifth

Amendment requires that a defendant be charged with only those charges brought before the grand jury. U.S. CONST. amend. V. An indictment satisfies these constitutional requirements "if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Maney,* 226 F.3d at 663 (citing *Hamling v. United States,* 418 U.S. 87, 117 (1974); *Russell v. United States,* 369 U.S. 749, 763-64 (1962); *United States v. Sturman,* 951 F.2d 1466, 1478-79 (6th Cir.1991)). "To be legally sufficient, the indictment must assert facts which in law constitute an offense; and which, if proved, would establish prima facie the defendant's commission of that crime." *Id.* (quoting *United States v. Superior Growers Supply, Inc.,* 982 F.2d 173, 177 (6th Cir.1992)).

"An indictment is usually sufficient if it states the offense using the words of the statute itself, as long as the statute fully and unambiguously states all the elements of the offense." *United States v. Landham*, 251 F.3d 1072, 1079 (6th Cir. 2001) (citing *Hamling,* 418 U.S. at 117; *United States v. Monus,* 128 F.3d 376, 388 (1997)). The Supreme Court has cautioned, however, that while "the language of the statute may be used in the general description of the offense, …it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *Hamling,* 418 U.S. at 117-18 (internal quotation marks and citation omitted). "'Courts utilize a common sense construction in determining whether an indictment sufficiently informs a defendant of an offense.'" *Maney,* 226 F.3d at 663 (quoting *Allen v. United States,* 867 F.2d 969, 971 (6th Cir.1989)).

Count1 (interstate stalking)[1], Count 2 (cyberstalking)[2] and Count 4 (telephone harassment)[3] track the language of the

[1]Count 1 of the indictment charges Bowker with interstate stalking, in violation of 18 U.S.C. § 2261A(1). That section penalizes whoever:

> travels in interstate or foreign commerce or within the special maritime and territorial jurisdiction of the United States, or enters or leaves Indian country, with the intent to kill, injure, harass, or intimidate another person, and in the course of, or as a result of, such travel places that person in reasonable fear of the death of, or serious bodily injury to, that person, a member of the immediate family (as defined in section 115) of that person, or the spouse or intimate partner of that person.

[2]Count 2 of the indictment charges Bowker with cyberstalking, in violation of 18 U.S.C. § 2261A(2). That section penalizes whoever:

> with the intent--
> **(A)** to kill or injure a person in another State or tribal jurisdiction or within the special maritime and territorial jurisdiction of the United States; or
> **(B)** to place a person in another State or tribal jurisdiction, or within the special maritime and territorial jurisdiction of the United States, in reasonable fear of the death of, or serious bodily injury to--
>> **(i)** that person;
>> **(ii)** a member of the immediate family (as defined in section 115) of that person; or
>> **(iii)** a spouse or intimate partner of that person,
> uses the mail or any facility of interstate or foreign commerce to engage in a course of conduct that places that person in reasonable fear of the death of, or serious bodily injury to, any of the persons described in clauses (i) through (iii).

[3]Count 4 of the indictment charges Bowker with telephone harassment, in violation of 47 U.S.C. § 223(a)(1)(C). That section penalizes whoever:

> **(1)** in interstate or foreign communications–

>> **(C)** makes a telephone call or utilizes a telecommunications

relevant statutes. Count 1 alleges that, between July 10 and July 30, 2001, Bowker knowingly and intentionally traveled across the Ohio state line with the intent to injure, harass, and intimidate Tina Knight, and as a result of such travel placed Knight in reasonable fear of death or serious bodily injury, in violation of 18 U.S.C. § 2261A(1). Count 2 alleges that between December 25, 2000 and August 18, 2001 Bowker, located in Ohio, knowingly and repeatedly used the internet to engage in a course of conduct that intentionally placed Knight, then located in West Virginia, in reasonable fear of death or serious bodily injury, in violation of 18 U.S.C. § 2261A(2). Count 4 alleges that between June 12, 2001, and August 27, 2001, Bowker, located in Ohio, knowingly made telephone calls, whether or not conversation or communication ensued, without disclosing his identity and with the intent to annoy, abuse, threaten and harass Knight, in violation of 47 U.S.C. § 223(a)(1)(C). Because the indictment stated all of the statutory elements of the offenses, and because the relevant statutes state the elements unambiguously, the district court properly denied Bowker's motion to dismiss Counts 1, 2 and 4 of the indictment. The indictment's reference to the specific dates and locations of the offenses, as well as the means used to carry them out (travel, internet, telephone), provided Bowker fair notice of the conduct with which he was being charged.

Relying on the *Landham* case, *supra,* Bowker argues that the indictment was defective because it does not charge him with making direct threats against Knight and therefore should have contained a statement of facts and circumstances surrounding the alleged indirect threats he made against her, such as an explanation of the parties' relationship. *See Landham,* 251 F.3d at 1080 (holding "because the alleged

---

device, whether or not conversation or communication ensues, without disclosing his identity and with intent to annoy, abuse, threaten, or harass any person at the called number or who receives the communications.

threatening statement must be viewed from the objective perspective of the recipient, which frequently involves the context of the parties' relationship…, it is incumbent on the Government to make that context clear in such an indictment, unless the alleged threat is direct").

*Landham* is distinguishable, however. There, the Court held that the indictment failed to sufficiently allege a kidnaping threat because the indictment was missing several elements of the offense, specifically, a communication containing a threat and a threat to kidnap. *Id.* at 1082. The indictment failed to acknowledge that the defendant had been in a custody battle with his ex-wife over their daughter and, therefore, the defendant's obscure statements like "I'm going to get her" were either unreasonably perceived to be kidnaping threats and, even if the alleged threat had been carried out, it would not have constituted a crime as a matter of substantive law. *Id.* at 1081-83. The Court further held that the indictment failed to sufficiently allege a threat of bodily harm, because the statement charged in the indictment referred to past conduct of the defendant, not present or future conduct, and, in any event, did not mention a threat to inflict bodily harm. *Id.* at 1082-83. Bowker's indictment, by contrast, did not contain similar deficiencies. All of the statutory elements of the prohibited conduct were properly alleged, including the intent to cause a reasonable fear of death or serious bodily harm. And unlike the parties involved in *Landham,* whose custody battle was highly relevant to the charged conduct, Bowker's relationship with Knight had no relevant bearing on the alleged illegality of his conduct. We therefore reject Bowker's challenge to the sufficiency of the indictment.

### B.  Overbreadth Challenge

According to the Supreme Court, imprecise laws can be attacked on their face under two different doctrines – overbreadth and vagueness. *City of Chicago v. Morales,* 527 U.S. 41, 529 (1999). The "overbreadth doctrine is a limited

exception to the traditional standing rule that a person to whom a statute may constitutionally be applied may not challenge that statute on the basis that it may conceivably be applied in an unconstitutional manner to others not before the court." *Staley v. Jones,* 239 F.3d 769, 784 (6th Cir. 2001) (citations omitted). However, "overbreadth scrutiny diminishes as the behavior regulated by the statute moves from pure speech toward harmful, unprotected conduct." *Id.* at 785. "'[P]articularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.'" *Id.* (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 615-161 (1973)).

Bowker has provided absolutely no argument as to how 18 U.S.C. § 2261A, which prohibits interstate stalking and cyberstalking, is facially overbroad, merely asserting that the statute "reaches large amounts of protected speech and conduct" and "potentially targets political or religious speech." We fail to see how a law that prohibits interstate travel with the intent to kill, injure, harass or intimidate has a substantial sweep of constitutionally protected conduct. 18 U.S.C. § 2261A(1). The same is true with respect to the prohibition of intentionally using the internet in a course of conduct that places a person in reasonable fear of death or seriously bodily injury. 18 U.S.C. § 2261A(2). It is difficult to imagine what constitutionally-protected political or religious speech would fall under these statutory prohibitions. Most, if not all, of these laws' legal applications are to conduct that is not protected by the First Amendment. Thus, Bowker has failed to demonstrate how 18 U.S.C. § 2261A is substantially overbroad.

We also reject Bowker's argument as to the purported overbreadth of the telephone harassment statute, 47 U.S.C. § 223(a)(1)(C). Bowker relies on the Supreme Court's decision in *Coates v. City of Cincinnati,* 402 U.S. 611 (1971), which involved a city ordinance that made it a criminal offense for three or more persons to assemble on a sidewalk

and to be "annoying" to passersby. *Id.* at 611. The Court struck down the ordinance, reasoning that it was "unconstitutionally broad because it authorizes the punishment of constitutionally protected conduct." *Id.* at 614.

*Coates* is distinguishable. First, the focus of the telephone harassment statute is not simply annoying telephonic communications. It also prohibits abusive, threatening or harassing communications. Thus, the thrust of the statute is to prohibit communications intended to instill fear in the victim, not to provoke a discussion about political issues of the day. *See United States v. Lampley,* 573 F.2d 783, 787 (3d Cir. 1978) (holding that in enacting the telephone harassment statute, "Congress had a compelling interest in the protection of innocent individuals from fear, abuse or annoyance at the hands of persons who employ the telephone, not to communicate, but for other unjustifiable motives") (citations omitted). Second, the telephone harassment statute operates in a distinctly different realm of communication than the ordinance in *Coates,* which governed the manner in which individuals could assemble and communicate in the open on public property. Persons who find sidewalk speech annoying usually are not being singled out by the speaker and, in any event, have the option of ignoring that speech by walking away or taking a different route. Because the sidewalk speaker is operating in the open, annoyed listeners have little reason to fear for their safety and can readily identify and confront the speaker if they so choose. Not so with individuals receiving unwelcome, anonymous telephone calls. Call recipients have to deal with much more inconvenience to avoid the speech (e.g., changing telephone numbers or using a call-screening service); these calls usually are targeted toward a particular victim and are received outside of a public forum (e.g., the home or the workplace); and, because the caller does not identify himself, the speech is more likely to instill fear in the listener and, at a minimum, makes it more difficult for the listener to confront the caller. Accordingly, the domain of prohibited speech is far more circumscribed, and the government's interest in protecting recipients of the

speech is far more compelling, under the telephone harassment statute compared to the city ordinance at issue in *Coates.*

We acknowledge that the telephone harassment statute, if interpreted to its semantic limits, may have unconstitutional applications. For example, if Bowker had been charged with placing anonymous telephone calls to a public official with the intent to annoy him or her about a political issue, the telephone harassment statute might have been unconstitutional as applied to him. *See United States v. Popa,* 187 F.3d 672, 677-78 (D.C. Cir. 1999) (holding that telephone harassment statute was unconstitutional as applied to defendant who had placed seven calls to a U.S. Attorney to complain about his treatment by the police and the prosecutor's conduct of a case against him). But Bowker was not so charged. His calls were predominately, if not exclusively, for the purpose of invading his victim's privacy and communicating express and implied threats of bodily harm. This type of speech is not constitutionally protected. *Landham,* 251 F.3d at 1080. But the fact that application of the telephone harassment statute may be unconstitutional in certain instances does not warrant facial invalidation. *See Parker v. Levy,* 417 U.S. 733, 760 (1974) (facial invalidation not appropriate when the remainder of the statute "covers a whole range of easily identifiable and constitutionally proscribable conduct"); *Staley,* 239 F.3d at 786-87 (holding that "several examples of speech or expressive conduct that could conceivably be restricted under the statute" did not render anti-stalking statute unconstitutional). Whatever overbreadth exists in the statute "can be cured on a case-by-case basis." *Staley,* 239 F.3d at 787 (citing *Broadrick,* 413 U.S. at 615-16). No cure is necessary in this case.

## C.  Vagueness Challenge

"[E]ven if an enactment does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague because it fails to establish standards for the police and

public that are sufficient to guard against the arbitrary deprivation of liberty interests." *Morales,* 527 U.S. at 52 (citing *Kolender v. Lawson,* 461 U.S. 352, 358 (1983)). Vagueness may invalidate a criminal statute if it either (1) fails "to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits" or (2) authorizes or encourages "arbitrary and discriminatory enforcement." *Id.* at 56 (citing *Kolender,* 461 U.S. at 357). "It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits...." *Giaccio v. Pennsylvania,* 382 U.S. 399, 402-03 (1966).

The stalking and telephone harassment statutes charged in Bowker's indictment provide sufficient notice of their respective prohibitions because citizens need not guess what terms such as "harass" and "intimidate" mean. This Court's decision in *Staley v. Jones, supra,* is instructive. That case involved a habeas corpus review of a conviction for stalking under a Michigan law that defines stalking as "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested." Mich. Comp. Laws Ann. § 750.411i(e). Michigan law defines "harassment" as "conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable individual to suffer emotional distress and that actually causes the victim to suffer emotional distress." *Id.* § 750.411i(d). Expressly excluded from the definition of "harassment" is "constitutionally protected activity or conduct that serves a legitimate purpose." *Id.* This Court rejected the petitioner's vagueness challenge to the Michigan statute, reasoning as follows:

A person of reasonable intelligence would not need to guess at the meaning of the stalking statutes, nor would

his interpretation of the statutory language differ with regard to the statutes' application, in part because the definitions of crucial words and phrases that are provided in the statutes are clear and would be understandable to a reasonable person reading the statute.... Also, the meaning of the words used to describe the conduct can be ascertained fairly by reference to judicial decisions, common law, dictionaries, and the words themselves because they possess a common and generally accepted meaning. We therefore conclude that the statutes are not void for vagueness on the basis of inadequate notice.

*Staley,* 239 F.3d at 791 -92.

The Michigan prohibition against willful harassment that causes a reasonable person to feel fear is almost indistinguishable from the federal anti-stalking statute, 18 U.S.C. § 2261A(1), which prohibits intentional harassment that causes a reasonable fear of death or serious bodily injury. In fact, the federal statute arguably is less vague because it circumscribes the type of fear a victim must feel, namely a fear of death or serious bodily injury, whereas the Michigan law does not.

Bowker attempts to distinguish the Michigan statute by pointing to the fact that Michigan law defines the word "harassment," whereas federal law does not. The harassment definition under Michigan law, however, contains nothing not already reflected in the federal statute's general prohibition. The Michigan definition of harassment requires conduct directed toward a victim, but this requirement is implicitly reflected in the federal statute's requirement that a perpetrator intend to harass a victim. Michigan's harassment definition also requires that the conduct cause a reasonable individual to suffer emotional distress, but the federal statute requires conduct that causes a fear of death or serious bodily injury. There simply is no principled basis to distinguish the language of the federal statute from the Michigan statute which this Court upheld in *Staley.*

We also reject Bowker's argument that the stalking and telephone harassment statutes' failure to define words like "harass" and "intimidate" render them void for vagueness. As noted by the Court in *Staley,* the meaning of these words "can be ascertained fairly by reference to judicial decisions, common law, dictionaries, and the words themselves because they possess a common and generally accepted meaning." *Staley,* 239 F.3d at 791-92. Indeed, the Michigan anti-stalking statute, which the *Staley* Court upheld, does not appear to define the word "intimidate," a word that Bowker claims is too vague in the federal law. For this reason as well, we reject Bowker's vagueness challenge to the federal law.

Bowker's reliance on *Church of the Am. Knights of the Ku Klux Klan v. City of Erie,* 99 F. Supp. 2d 583 (W.D. Pa. 2000), also is misplaced. There, the court held that a city ordinance that restricted the wearing of a mask "with the intent to intimidate, threaten, abuse or harass any other person" was unconstitutionally vague. *Id.* at 591 (quotation marks and statutory citation omitted). The court found that each of these terms, given their ordinary meaning, could encompass forms of expression that are constitutionally protected. *Id.* Not only might it prohibit certain types of advocacy, such as advocating the return to segregation, but it also might prohibit the simple act of wearing a mask. *Id.* The court also found that the ordinance did not provide the public with adequate notice of what type of conduct was prohibited. The ordinance, however, is not comparable to the federal anti-stalking statute. The federal anti-stalking statute, which prohibits harassment or intimidation that causes a reasonable fear of death or serious bodily harm, imposes a far more concrete harm requirement than the ordinance at issue in *Ku Klux Klan,* which did not require that the harassment or intimidation result in any particular type of reaction in the audience. *See id.* at 592 (holding that ordinance was unconstitutionally vague: "To some extent, the speaker's liability is potentially defined by the reaction or sensibilities of the listener; what is 'intimidating or threatening' to one person may not be to another. And, although the provision

has a scienter requirement, it is reasonable to expect that the requisite intent could be inferred from circumstantial factors, which may include the effect that particular speech has on the speaker's audience.").

We further reject Bowker's argument that the federal stalking and telephone harassment statutes authorize or encourage arbitrary or discriminatory enforcement. Although the statutes provide no guidelines on terms like harass and intimidate, the meanings of these terms "can be ascertained fairly by reference to judicial decisions, common law, dictionaries, and the words themselves because they possess a common and generally accepted meaning." *Staley,* 239 F.3d at 791-92. Thus, Bowker has not demonstrated that these statutes fail to provide "sufficiently specific limits on the enforcement discretion of the police to meet constitutional standards for definiteness and clarity." *Morales,* 527 U.S. at 64 (internal quotation marks and citation omitted).

Only Bowker's vagueness challenge to part of the telephone harassment statute, 47 U.S.C. § 223(a)(1)(C), merits further discussion. As noted above, that statute prohibits using a telephone, without disclosing identity, with the intent to annoy, abuse, threaten, or harass any person at the number called. Bowker argues that the term "annoy" is unconstitutionally vague, relying on the Supreme Court's decision in *Coates, supra.* In rejecting the city ordinance which made it a criminal offense for three or more persons to assemble on a sidewalk and to be "annoying" to passersby, the Court reasoned:

> In our opinion this ordinance is unconstitutionally vague because it subjects the exercise of the right of assembly to an unascertainable standard, and unconstitutionally broad because it authorizes the punishment of constitutionally protected conduct. Conduct that annoys some people does not annoy others. Thus, the ordinance is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible

> normative standard, but rather in the sense that no standard of conduct is specified at all.

*Id.* at 614. The Court further held that the ordinance violated the First Amendment right to freedom of assembly because the "First and Fourteenth Amendments do not permit a State to make criminal the exercise of the right of assembly simply because its exercise may be 'annoying' to some people." *Id.* at 615.

We agree that the word "annoy," standing alone and devoid of context and definition, may pose vagueness concerns. But that is not the case with the telephone harassment statute. The statute reads "annoy, abuse, threaten, or harass." 47 U.S.C. § 223(a)(1)(C). The Supreme Court has observed that "[c]anons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, *unless the context dictates otherwise.*" *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339 (1979) (emphasis added). Here, the statutory language must be read in the context of Congressional intent to protect innocent individuals from fear, abuse or annoyance at the hands of persons who employ the telephone, not to communicate, but for other unjustifiable motives. *Lampley,* 573 F.2d at 787. This context suggests that the words annoy, abuse, threaten or harass should be read together to be given similar meanings. Any vagueness associated with the word "annoy" is mitigated by the fact that the meanings of "threaten" and "harass" can easily be ascertained and have generally accepted meanings. *Staley,* 239 F.3d at 791-92,

Even assuming, *arguendo,* that Bowker's vagueness argument theoretically has merit, he cannot rely on it to invalidate the indictment or his conviction for telephone harassment, because the statute clearly applies to the conduct he allegedly committed. The Supreme Court held in *Parker v. Levy supra,* 417 U.S. at 756:

…[O]ne who has received fair warning of the criminality of his own conduct from the statute in question is [not] entitled to attack it because the language would not give similar fair warning with respect to other conduct which might be within its broad and literal ambit. One to whose conduct a statute clearly applies may not successfully challenge it for vagueness.

Here, Bowker engaged in an anonymous campaign of threatening and harassing conduct directed toward Knight through use of the telephone (as well as the mails and the computer) that clearly fell within the statute's prohibition. This type of conduct lies at the core of what the telephone harassment statute was designed to prohibit. *Lampley,* 573 F.2d at 787. FBI Agent Hassman specifically warned Bowker that he might be arrested if he persisted in his course of telephone harassment, but Bowker ignored that warning. Moreover, the fact that Bowker engaged in this campaign with an intent to threaten or harass mitigates any concern that he may have been punished for merely having a communication over the telephone. As the Third Circuit held in rejecting a vagueness challenge to the very same statutory language:

> The section's specific intent requirement renders unconvincing appellant's second claim that [the predecessor to § 223(a)(1)(C) is] unconstitutionally vague. It has long been true that (t)he Court, indeed, has recognized that the requirement of a specific intent to do a prohibited act may avoid those consequences to the accused which may otherwise render a vague or indefinite statute invalid. . . . (W)here the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law. *Screws v. United States,* 325 U.S. 91, 101-02, 65 S.Ct. 1031, 1035, 89 L.Ed. 1495 (1945). The appellant cannot claim confusion about the conduct proscribed

> where, as here, the statute precisely specifies that the actor must intend to perform acts of harassment in order to be culpable.

*Lampley,* 573 F.2d at 787. Thus, Bowker vagueness challenge fails. The district court did not err in denying his motion to dismiss Counts 1, 2 and 4 of the indictment.

## IV
## Motion to Sever Count 3 from the Indictment

The district court denied Bowker's motion to sever Count 3 of the indictment (mail theft) from Counts 1 (interstate stalking), 2 (interstate stalking), and 4 (telephone harassment). Bowker had argued that joinder of these counts would prejudice his rights under the Fifth Amendment and Rules 8 and 14 of the Federal Rules of Criminal Procedure. Specifically, he argued that the mail theft count should not be admissible to support the other three counts for stalking and telephone harassment on the ground that the crimes did not possess the same or similar characteristics and that there was no nexus between the mail theft count and the other alleged crimes. He further argued that he wished to testify concerning the stalking and telephone harassment counts, which require the government to prove intent, but not the mail theft count, and that joinder precluded him from exercising his Fifth Amendment right to testify only as to the stalking and telephone harassment counts. Last, he argued that the jury's exposure to evidence pertaining to the stalking and telephone harassment counts would prejudice them in deciding the mail theft count. Bowker renews these arguments on appeal.

A motion for relief from the prejudicial joinder of counts must be renewed at the close of the evidence. *United States v. Hudson,* 53 F.3d 744, 747 (6th Cir. 1995). When the defendant fails to renew the motion, this Court can reverse a conviction only upon a showing of plain error. *United States v. Anderson,* 89 F.3d 1306, 1312 (6th Cir. 1996). Bowker

failed to renew his motion to sever Count 3 of the indictment from Counts 1, 2 and 4 at the close of the evidence. Accordingly, he must demonstrate plain error by the district court.

Federal Rule of Criminal Procedure 8 provides, in relevant part:

> **(a) Joinder of Offenses.** The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged—whether felonies or misdemeanors or both—are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Fed. R. Crim. P. 8(a). Rule 14 provides, in relevant part:

> **(a) Relief.** If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim. P. 14(a). The record clearly shows that all of the counts in Bowker's indictment were of the same or similar character and that the allegations thereunder were an integral part of Bowker's common scheme to harass and threaten Knight. This scheme involved a 14-month campaign of sending emails and regular mail and placing telephone calls to her workplace in Youngstown; sending mail to her parent's home; placing telephone calls to Knight's unpublished home number in West Virginia; placing telephone calls to Knight's West Virginia workplace; sending mail to Knight's West Virginia home; and stealing Knight's mail from her West Virginia home. Thus, all of the counts properly were joined pursuant to Rule 8, and the district court did not plainly err under Rule 14 by refusing to sever the mail theft count.

Bowker also has not demonstrated that the district court committed plain error when it rejected his argument that severance was required in order to permit him to testify as to the mail theft count, but to avoid testimony as to the stalking and telephone harassment counts. The Tenth Circuit confronted a similar argument in *United States v. Martin,* 18 F.3d 1515, 1518-19 (10th Cir. 1994), stating:

> Martin contends that the denial of his severance motion "forced [him] to testify at trial and convict himself as to the drug count in an attempt to win an acquittal of the gun count."…Martin further contends that inasmuch as he "had both important testimony to give concerning one count and a strong need to refrain from testifying on the other," …the district court's refusal to sever the counts deprived him of a fair trial.…[N]o need for a severance exists until the defendant makes a convincing showing that he has both important testimony to give concerning one count and a strong need to refrain from testifying on the other. Applying these standards to our case, we hold that Martin failed to demonstrate a convincing need for a severance.

Several other circuits have applied the same or similar standards. *E.g., United States. v. Alosa,* 14 F.3d 693, 695 (1st Cir. 1994) (holding that defendant did not deserve severance because he failed to make a convincing showing that he had both important testimony to give concerning one count and a strong need to refrain from testifying on the other); *United States v. Gorecki,* 813 F.2d 40, 43 (3d Cir. 1987) (holding that defendant's bare allegation that the joinder of counts prevented his testimony on one count, without a specific showing as to what that testimony may have been, failed to meet the stringent requirements for severance under Rule 14); *United States v. Ballis,* 28 F.3d 1399, 1408 (5th Cir. 1994) (affirming denial of severance because defendant did not point out this alleged dilemma in testifying about some counts but not others with sufficient specificity for the trial court to have abused its discretion in denying the motion); *United*

*States v. Alexander,* 135 F.3d 470, 477 (7th Cir. 1998) (noting that there may be cases in which a defendant can convincingly show that he has important testimony to give on one count but a strong need to remain silent on another, and in that circumstance, severance may be required; affirming denial of severance because defendant failed to provide specific examples of the exculpatory testimony that he would testify about).

It is clear that Bowker failed to make a "convincing showing" that he had important testimony concerning the interstate stalking and telephone harassment counts, as well as a "strong need" to refrain from testifying on the mail theft count. Indeed, his motion to sever provided absolutely no indication as to what his testimony would be on the stalking and harassment counts, stating only that his testimony was "anticipated to be crucial" because these crimes have a specific intent requirement. In addition, Bowker showed absolutely no need to avoid testifying on the mail theft count, merely arguing that his testimony on this count was "not needed" because mail theft lacks a specific intent requirement. Such non-specific assertions of prejudice are insufficient to warrant severance under Rule 14. For these reasons, the district court did not commit plain error in refusing to sever the counts of the indictment.

## V
### Right to Self-Representation

Bowker argues that he is entitled to a new trial because the district court denied his constitutional right to represent himself. We review such a denial for an abuse of discretion. *Robards v. Rees,* 789 F.2d 379, 384 (6th Cir. 1986).

On January 22, 2002, Bowker, then represented by counsel, filed on his own initiative a hand-written motion "for release of appointed attorney." In that motion, Bowker stated, "Now Comes Defendant, being first advised of his rights to an attorney, and does now knowingly, willingly, and

intelligently waive his rights, to court-appointed counsel." The district court purported to deny that motion via a hand-written minute order on January 28, 2002, stating that "Defendant's pro se motion for new counsel is denied." The court did not refer to the fact that Bowker's motion did not seek new counsel, but to waive his right to counsel. Bowker, however, soon had a change of heart about representing himself because on March 26, 2002, Bowker's attorney moved to withdraw as counsel due to "the fractured lawyer-client relationship." In an attached statement signed by Bowker, Bowker requested that his appointed lawyer withdraw from the case "and that a new lawyer be appointed to represent" him. The court granted the motion on April 10, 2002 and appointed a new federal public defender for Bowker on April 22, 2002.

The sixth and fourteenth amendments guarantee state criminal defendants the right of self-representation at trial. *See Faretta v. California,* 422 U.S. 806 (1975). Since it is more likely than not that a defendant would fare better with the assistance of counsel, *id.* at 835, he will be permitted to represent himself only when he "knowingly and intelligently" relinquishes his right to counsel. *Id.* Such a knowing waiver must be made by a "clear and unequivocal" assertion of the right to self-representation. *Id.* "Once there is a clear assertion of that right, the court must conduct a hearing to ensure that the defendant is fully aware of the dangers and disadvantages of proceeding without counsel." *Raulerson v. Wainwright,* 732 F.2d 803, 808 (11th Cir. 1984) (citation omitted).

We hold that the district court erred in denying Bowker's January 22, 2002 motion to represent himself which was accompanied by a clear and unequivocal assertion of the right to self-representation. At a minimum, the court should have conducted some inquiry into the bases for Bowker's motion. It is not apparent from the record that the district court did anything other than misconstrue the motion as a motion for appointment of new counsel and then deny the motion.

Nevertheless, the district court's error was rendered harmless by Bowker's change of heart about self-representation over two months prior to trial. As noted above, after being denied the right to represent himself, Bowker explicitly joined his then-attorney's motion to withdraw from the case and to have new counsel appointed for him. Thus, Bowker's last indication to the district court on the matter was that he did not wish to represent himself. *Cf. id.* at 809 ("Even if Raulerson's letter of July 18, 1980 constituted a clear and unequivocal demand to represent himself, his agreement to proceed with the assistance of an attorney waived that original request...."). Accordingly, the district court's erroneous disposition of the January 22, 2002 motion for self-representation was rendered harmless error by Bowker's subsequent waiver of his right to self-representation. Bowker, therefore, is not entitled to a new trial.

## VI
## Motion to Return Seized Property

On February 5, 2002, Bowker filed a *pro se* motion for return of seized property and items, pursuant to Rule 41 of the Federal Rules of Criminal Procedure. He sought an order from the court directing the government to return all items and tangible objects which were not going to be used as evidence in his case. As of May 29, 2002, the district court had not yet ruled on the motion, so Bowker filed a "request for ruling on motion for return of property." On June 4, 2002, the district court denied Bowker's request for a ruling on the motion for return of property. No reasons were provided by the court for the denial, and the district court never held a hearing on, nor has it ever ruled on, the underlying motion for return of property.

Rule 41 provides, in relevant part:

**(g) Motion to Return Property.** A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's

return. The motion must be filed in the district where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.

Fed. R. Crim. P. 41(g). In *United States v. Hess,* 982 F.2d 181 (6th Cir. 1992), this Court observed that "'[a] district court has both the jurisdiction and the duty to return the contested property once the government's need for it has ended.'" *Id.* at 187 (internal quotation marks omitted; quoting *United States v. Martinson,* 809 F.2d 1364, 1370 (9th Cir.1987) (citing *United States v. Wilson,* 540 F.2d 1100, 1103-04 (D.C. Cir.1976)). There, the district court had failed to address the legal or factual issues raised in a party's motion for return of seized records. The Court found it significant that no hearing was held regarding who was entitled to possession of the documents, and the district court had failed to consider the merits of the moving party's arguments. The Court also was troubled because there were no findings of fact or conclusions of law regarding which party was entitled to retain the records. Accordingly, the Court held that the district court did not discharge its duty under Rule 41(g) to hear and decide the issues, reasoning that Rule 41(g) "clearly contemplates a hearing 'on any issue of fact necessary to the decision of the motion.'" *Id.* at 186.

*Hess* is directly on point. The district court below simply ignored Bowker's motion to return records, and when Bowker filed a motion to have the court rule on that motion, the court denied the motion, without ever reaching the merits of the underlying motion. The court held no hearing, took no evidence, and gave no indication that it ever has considered the merits of Bowker's motion. Accordingly, on remand, the district court shall hold a hearing on Bowker's motion for return of records, take evidence on any factual issues

necessary to resolve that motion, and promptly rule on that motion.

## VII
## Motion for a Judgment of Acquittal as to Counts 1, 2 and 4

Bowker challenges the district court's failure to grant his motion for a judgment of acquittal on Counts 1, 2 and 4 of the indictment, pursuant to Rule 29 of the Federal Rules of Criminal Procedure. For the reasons that follow, we affirm the judgment of the district court.

### A.   Standard of Review

"In reviewing a district court's denial of a motion for judgment of acquittal on a claim of insufficient evidence, 'the relevant question is whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Lloyd,* 10 F.3d 1197, 1210 (6th Cir. 1993) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)). "If the evidence, however, is such that a rational fact finder must conclude that a reasonable doubt is raised, this court is obligated to reverse a denial of an acquittal motion." *Id.* (quoting *United States v. Collon,* 426 F.2d 939, 942 (6th Cir.1970)). The district court's findings of fact are reviewed for clear error, and circumstantial evidence alone is sufficient to sustain a conviction. *Nationwide Mut. Ins. Co. v. Home Ins. Co.,* 278 F.3d 621, 625 (6th Cir. 2002); *United States v. Peters,* 15 F.3d 540, 544 (6th Cir. 1994).

### B.   Interstate Stalking Count

Count 1 of the indictment charges Bowker with interstate stalking, in violation of 18 U.S.C. § 2261A(1). The government was required to prove:

(1)  that the defendant traveled in interstate or foreign commerce;

(2) with the intent to kill, injure, harass, or intimidate another person; and

(3) in the course of, or as a result of, such travel places that person in reasonable fear of the death of, or serious bodily injury to, that person, a member of the immediate family of that person, or the spouse or intimate partner of that person.

Bowker argues that the government did not prove, pursuant to the interstate stalking count, that the "result of" Bowker's travel  from Ohio to West Virginia in July, 2001, was to put Knight in reasonable fear of her life or bodily injury, because Knight  did not learn of Bowker's travels until August 2001, after he had completed his travel. This argument is specious. Knight learned of Bowker's travel to West Virginia because he sent her numerous photographs informing her that he had been in the state the preceding month. Accompanying the photographs was the statement, "Take the photos out to read the backs of them. Send me an E-mail address. It keeps me long distance, you know what I mean." The clear implication of this statement was that Bowker would continue to communicate with Knight, unless she provided him with her email address.  The jury was entitled to infer that this statement, combined with the photographs of Bowker at various locations in West Virginia, was intended to intimidate Knight by showing her that Bowker had traveled to her state and would do so in the future. The statute did not require the government to show that Bowker actually intended to harass or intimidate Knight during his travels, only that the result of the travel was a reasonable apprehension of fear in the victim. Since Knight testified that she was afraid that Bowker might rape her, and her fear seemed reasonable, the government proved all of the elements of the interstate stalking count.

## C.   Cyberstalking Count

Count 2 of the indictment charges Bowker with cyberstalking, in violation of 18 U.S.C. § 2261A(2).  The government was required to prove:

(1) Bowker intentionally used the mail or any facility of interstate or foreign commerce;
(2) Bowker engaged in a course of conduct with the intent to place Knight in reasonable fear of death of, or serious bodily injury to, herself, her spouse or intimate partner, or a member of her immediate family; and
(3) Bowker's course of conduct actually placed Knight in reasonable fear of death of, or serious bodily injury to, herself.

The evidence shows that Bowker's intended to instill in Knight a fear of death or serious bodily harm  through use of the mails and other facilities of interstate commerce, required elements of the cyberstalking count.  During a June 12, 2001 telephone conversation with Knight, Bowker told her:

You don't know where I'm at.  I might be in your house in Dunbar[, West Virginia]; you don't know that.… I know all of your neighbors.… And I have access to all that information, just like anybody else does who knows where to find it.  I have an enormous amount of things about you that I'm not going to disclose unless I have to. I'm not going to tell anybody about it except if you lie to me.  I might not say anything to you at the time, but that might come back, you know.… I know the names of all your relatives and where they live.… I know your brothers' wives['] names, their ages, their Social Security numbers and their birth dates … and their property values.… Maybe I live on 20th street in Dunbar.… Maybe I watch you with binoculars all the time and maybe I don't.

(J.A. 985-88, 1000.)  A July 16, 2001 letter that Bowker sent to Knight at the television station had both sexual and threatening connotations.  It read, in part:

No. 1. You do not hang up on me.
No. 2.  You do not hang up on me, ever.
No. 3.  If and when I call CBS 13 asking about a news story that you reported on, you do not hang up on me. You must at least do the bare minimum and answer my news related questions.
I know what you value most in life, your bullshit fake ass 1997 Pontiac Grand Am, which is about top on your list as well as two other things.  As far as the Grand Am is concerned, say good-bye to it.  I am going to file a mechanics lien on it immediately and later seek civil forfeiture.
All that you . . . would have to do is be polite, be nice, and answer my news-related questions, just like the rest of the reporters, except your buddy April Kaull.  I'm going to file a lien on her vehicle too. You are both fuck-ups, assholes and seriously emotionally and mentally unbalanced.…
Also, WOWK will hire just about anyone.  Or at least a pretty girl reporter, as long as she does her hair and makeup well.…
That vehicle is exemplary of you, pretty on the outside and very worthless inside. You have female genitals and that is about it.  You are a very slander to the word woman.  Oh, yeah, you dress like one but so do transvestites.  I think I would rather spend the evening with a pretty transvestite than with you.…
Anyhow, I also think that it is time for your neighbors to get to know you better and I will be making attempts to inform them about how the prima donna from Ohio things [sic] she can eat from the top and throw her garbage on the sidewalk of West Virginia and Dunbar.…
I also noticed that you already had the job and residence in West Virginia when you had your Ohio License plates renewed, for one year anyhow.…

So bye-bye, fuck you, you are an asshole and a sociopath and an embarrassment to mothers everywhere, sir. In parenthesis: (I wasn't bringing up the mental case thing again since it is genetic.)

Yes, sir. Adios, Eric [sic]. Smooch. Smooch.

(J.A. 1011-15.) In August 2001, Bowker left a series of messages on Knight's answering machine asking that Knight or Knight's friend call him back, which did not occur. These messages contained statements that Knight reasonably could perceive to be threats to her personal safety. Excerpts include the following statements:

I don't even know why I'm nice to you ever at all, you and your fucked-up friend should not even be working in the media. You know you gotta mother-fucking realize there's like 50 percent men in this country and you better mother-fucking learn that you're going to have to deal with us sometime.…

Well, it looks like nobody is going to answer me if Tina Knight is okay, so I'm gonna take the 1:00 a.m. bus out of Columbus, Ohio and come down there and see for myself. Okay, I'll be there about 6:00 a.m. Bye.

(J.A. 1226-27.) Since Knight testified that these intentionally intimidating, threatening and harassing interstate communications made her afraid to leave the house everyday and that Bowker might try to rape her, the government proved all of the elements of the cyberstalking count.

**D.   Telephone Harassment Count**

Count 4 of the indictment charged Bowker with telephone harassment, in violation of 47 U.S.C. § 223(a)(1)(C). The government had to prove that:

(1)  Bowker made interstate telephone calls to Knight;
(2)  Bowker did not disclose his identity in the telephone calls; and

(3) in the telephone calls, whether or not conversation or communication ensued, Bowker intended to annoy, abuse, threaten, or harass Knight or any person at the called number.

Bowker's primary argument against his conviction for telephone harassment is that Knight allegedly was aware of Bowker's identity when she received his calls. The statute, however, does not preclude criminal responsibility merely because the recipient may suspect, or have a very good idea of, the caller's identity. Rather, assuming that Bowker called Knight with the requisite intent to annoy, abuse, threaten, or harass, the only issue is whether Bowker disclosed his identity in those calls. It is clear that in all of the at-issue telephone calls, Bowker never affirmatively identified himself as Erik Bowker. In fact, he denied being Bowker during a conversation with Knight on June 12, 2001, and instead stated that his name was Mike. Thus, a straightforward application of the telephone harassment statute shows that the jury reasonably found the non-disclosure element to be satisfied.

**VIII**
**Motion for a New Trial on Counts 1, 2 and 4**

The denial of a defendant's motion for a new trial under Federal Rule of Criminal Procedure 33 is reviewed for abuse of discretion. *United States v. Ashworth,* 836 F.2d 260, 266 (6th Cir. 1988). The Court is "limited to examining the evidence produced at trial to determine whether the district court's determination that the evidence does not 'preponderate heavily against the verdict' is a clear and manifest abuse of discretion." *Id.* (citation omitted). As discussed in the preceding section, there was ample evidence to support Bowker's convictions on Counts 1, 2 and 4 of the indictment. Thus, it was not an abuse of discretion to find that the evidence did not preponderate heavily against the verdict.

## IX
## Upward Departure for Extreme Psychological Harm to the Victim

After Bowker's convictions, he was sentenced pursuant to the 2000 edition of the United States Sentencing Commission Guidelines Manual ("Guidelines"). Based upon a final offense level of 19, and a criminal history corresponding to Category V, Bowker's Guidelines' range was between 57 and 71 months. The government moved for a three level upward departure in his sentence based on extreme psychological injury to the victim, Tina Knight. The basis for the motion was, in part, Guidelines § 5K2.3. The district court granted the motion for upward departure. Because Bowker argues that the sentence imposed by the district court was outside the applicable guideline range and was based on a factor that is not justified by the facts of the case, this Court reviews the district court's determination under a *de novo* standard. 18 U.S.C. § 3742(e).

Section 5K2.3 of the Guidelines provides:

§5K2.3. EXTREME PSYCHOLOGICAL INJURY (POLICY STATEMENT)

If a victim or victims suffered psychological injury much more serious than that normally resulting from commission of the offense, the court may increase the sentence above the authorized guideline range. The extent of the increase ordinarily should depend on the severity of the psychological injury and the extent to which the injury was intended or knowingly risked.

Normally, psychological injury would be sufficiently severe to warrant application of this adjustment only when there is a substantial impairment of the intellectual, psychological, emotional, or behavioral functioning of a victim, when the impairment is likely to be of an extended or continuous duration, and when the

impairment manifests itself by physical or psychological symptoms or by changes in behavior patterns. The court should consider the extent to which such harm was likely, given the nature of the defendant's conduct.

Guidelines §5K2.3 (Nov. 1, 2000). With regard to the crime of stalking, Guidelines § 2A6.2 instructs that "an upward departure may be warranted if the defendant stalked the victim on many occasions over a prolonged period of time." Guidelines § 2A6.2, Application Note 5.

The record shows that Bowker stalked Knight on many occasions and over a prolonged period of time. See Guidelines § 2A6.2, Application Note 5. FBI Special Agent James McNamara, an expert on stalking crimes, testified at the sentencing hearing as to the extreme nature of Bowker's conduct. McNamara pointed to the facts that the harassment occurred over a period of years and in two different states; involved numerous, multi-media contacts (letters, telephone calls, email and interstate travel); and involved contacts with Knight's friends and family members. Further, Bowker's campaign of harassment substantially impaired Knight's "behavioral functioning" as manifested by "changes in [her] behavior patterns." Guidelines § 5K2.3. Knight was so distressed that she was left with profound feelings of paranoia and felt compelled to change banks and unlist her phone number, and have her bills sent to a different address. She also purchased a gun, routinely uses a security escort, and, most unfortunately, decided to forgo her on-air news career.

Knight's Victim Impact Statement movingly captures the extreme psychological distress that Bowker's stalking activities inflicted on her:

The two years that I was stalked changed my family and me. First of all since the stalking began because of my job as a television news reporter it has turned me off to a future in that career....I don't want to be anyone's favorite newscaster because I fear it will turn into another

situation like the one I had.…I am also concerned about major purchases in the future, like a home, and how he may be able to track me down.…Even writing this I am careful not to mention anything about my personal life for fear he will read this and it will give him another means by which to contact me.…I am concerned about the rest of my life.…I am not confident this will stop. That is my biggest fear. When he gets out of jail this could start all over again so I truly can never relax. It's just putting off my ultimate fear that someday, no matter what I do, he will show up at my front door with intent to harm me. By now I've given him reason to really hate me in his mind. I testified against him in court and helped put him in jail. I hope he isn't out for revenge.[4]

We hold that the above-described facts amply justified the district court's upward departure determination. *Cf. United States v. Otto,* 64 F.3d 367, 371 (8th Cir. 1995) (affirming upward departure where stalking victim lived in constant fear for herself and for her children and was always on the lookout for the defendant; could not eat or sleep; lost weight; required counseling; and feared the defendant's ultimate release); *United States v. Miller,* 993 F.2d 16, 21 (2d Cir. 1993) (affirming upward departure after the defendant had engaged in a three year campaign of harassment; noting that the victim had been afraid to answer the telephone or open her mail for three years; was afraid to remain in the New York area; and believed that the years of harassment had hastened her husband's demise).

---

[4] Bowker made Knight's Victim Impact Statement part of the public record in the district court when he attached it as an exhibit to his response to the United States' motion for an upward departure.

## X
## Expert Testimony on Stalking

As noted in the preceding section, the government called an expert on stalking crimes, FBI Special Agent James McNamara, to testify at Bowker's sentencing hearing. Bowker argues that the district court's decision to hear the testimony of Agent McNamara was erroneous and that the court's decision should be reviewed for an abuse of discretion under Federal Rule of Evidence 702. The Federal Rules of Evidence, however, are by their own terms expressly inapplicable to sentencing hearings. Fed. R. Evid. 1101(d)(3). According to the federal statute that governs the use of information in sentencing, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. The Supreme Court has explained that this statute "codifies the longstanding principle that sentencing courts have broad discretion to consider various kinds of information." *United States v. Watts,* 519 U.S. 148, 151 (1997). Accordingly, this Court reviews the district court's admission of Agent McNamara's testimony for an abuse of discretion in determining that the testimony had "sufficient indicia of reliability to support its probable accuracy." Guidelines § 6A1.3(a).

Agent McNamara has been with the FBI for 15 years and is assigned to the FBI as a behavioral analyst. His duties include looking at the behavior of criminals, conducting research with convicted offenders and disseminating the results of that research, and working on active criminal cases as a law enforcement consultant. McNamara has been trained in a variety of disciplines, including criminal justice, psychology, forensic science, anthropology and psychology. Based on his review of transcripts and other materials pertaining to Bowker's case, McNamara testified that Bowker had engaged in multimedia attempts to contact Knight,

including letters, email, telephonic contacts, and the sending of gifts. McNamara opined that the sending of gifts in a stalking case is "significantly important in the areas of increased dangerousness." He further testified that Bowker escalated his activity, from contacts through the mail, to telephonic and electronic mail contact, to traveling interstate to pursue Knight. McNamara also indicated that Bowker's past history of violence, including domestic abuse, was a predictor of future dangerousness or violence. As a consequence of these findings, McNamara concluded that Bowker was a more dangerous type of stalker.

We hold that the district court did not abuse its discretion in admitting Agent McNamara's testimony at the sentencing hearing. His testimony was relevant to the court's application of Guidelines § 2A6.2, which determines how the base offense level is to be calculated for the crime of stalking. Guideline § 2A6.2 provides for a two-level increase in the base offense level for a pattern of activity involving stalking, threatening, harassing, or assaulting the same victim. McNamara's testimony directly addressed this issue. Agent McNamara's testimony also was relevant to determining whether an upward departure was warranted for extreme psychological injury to the victim. *See* Guidelines § 2A6.2, Application Note 5 (instructing that the severity of the stalking may warrant an upward departure). Therefore, the district court did not err in entertaining Agent McNamara's expert testimony at sentencing.

## XI
## Bowker's Right of Allocution

Federal Rule of Evidence 32(i)(4)(c)(ii) provides that, before imposing a sentence, the court must "address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence." Bowker argues that the district court denied him this right of allocution. We apply a *de novo* standard of review. *United States v. Wolfe,* 71 F.3d 611, 614 (6th Cir. 1995).

After Bowker's attorney cross-examined Agent McNamara, the FBI expert on stalking, the district court asked Bowker directly, "Is there anything that you have to say to this Court before it imposes sentence?" Bowker responded that he would like to read a lengthy statement, and the court told Bowker to proceed. Bowker began by challenging his prior criminal history. The court then went through each crime that formed the foundation for the assignment of a Criminal History Category V. Bowker then asked to address some things that occurred during his trial, and the court told him to proceed. Bowker gave a lengthy justification for his conduct underlying his convictions, complained about not being able to testify as to his intent, and pointed out that he has severe physical disabilities and mental problems. Bowker next complained about the performance of his attorney. Bowker then asked the court to have his mother testify, which the court permitted. The only request the district court appeared to deny Bowker was his desire to read a 15-page statement into the record. Based on the totality of the circumstances, we see no merit to Bowker's argument that he was denied the right of allocution. *Cf. United States v. Kellogg,* 955 F.2d 1244, 1250 (9th Cir. 1992) ("Although the defendant has a right of allocution at sentencing, that right is not unlimited.").

## XII
## Conclusion

For all the foregoing reasons, we **AFFIRM** Defendant Bowker's convictions and sentence. This case shall be **REMANDED** for the district court to conduct a hearing and to rule on Bowker's motion to return seized property.